FILED

Dec 21 2018, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Anne C. Kaiser
Deputy Public Defender

Katherine Province
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Roderick Vandrell Lewis,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | December 21, 2018<br><br>Court of Appeals Case No.<br>18A-PC-767<br><br>Appeal from the Allen Superior Court<br><br>The Honorable Frances C. Gull, Judge<br><br>Trial Court Cause No.<br>02D05-1305-PC-84 |

**Altice, Judge.**

**Case Summary**

"Judge I'm going to defer to Mr. Lewis if he has any comments. I don't have anything to add." *Sentencing Transcript* at 23-24. This is the sum total of trial counsel's participation at Lewis's sentencing hearing, at which Lewis was being sentenced for two counts of felony murder and faced a maximum sentence of 130 years in prison. The trial court found no mitigating circumstances – none being asserted by the defense – and sentenced Lewis to the maximum aggregate sentence of 130 years in prison.[1]

On direct appeal, appellate counsel presented only a sufficiency challenge, which this court rejected. Appellate counsel felt constrained by trial counsel's failure to argue any mitigating circumstances at sentencing. Had trial counsel made an adequate record at sentencing, appellate counsel would have challenged the sentence as inappropriate under Ind. Appellate Rule 7(B). Appellate counsel, however, chose not to raise this issue to avoid hindering Lewis's future pursuit of post-conviction relief based on trial counsel ineffectiveness.

After this court affirmed his convictions on direct appeal, Lewis sought post-conviction relief. He challenged the effectiveness of both trial and appellate counsel related to sentencing. The post-conviction court denied relief, and Lewis now appeals.

---

[1] The sentencing range for murder is forty-five to sixty-five years, with the advisory sentence being fifty-five years. Ind. Code § 35-50-2-3(a).

[4] We agree with Lewis that trial counsel's performance at sentencing was clearly deficient. After a thorough review of the record and applicable case law, however, we conclude that no prejudice resulted from the deficient performance. In other words, there is not a reasonable probability that Lewis's sentence would have been different if counsel had proffered the mitigating circumstances raised at the post-conviction hearing. Further, with regard to appellate counsel, we conclude that counsel was not ineffective.

[5] We affirm.

## Facts & Procedural History[2]

[6] The underlying facts supporting Lewis's convictions were set out in detail on direct appeal, and we draw from those. On June 29, 1999, Christopher Hale had a discussion with sixteen-year-old Richard Rogers, who operated a drug house in Fort Wayne with fourteen-year-old Sidney Wilson. Rogers invited Hale to visit the drug house, but Hale declined due to problems he was having with Wilson. Rogers indicated that he would talk with Wilson and quash it.

[7] Later that evening, Hale, Lewis, and Kajuanta Mays agreed on a plan to rob Wilson and Rogers of their drugs and money. First, they verified that Wilson and Rogers were alone by sending Angela Lawson to the house to buy drugs.

---

[2] Oral argument was held at the Walker Career Center at Warren Central High School in Indianapolis on December 4, 2018. We thank the staff for our warm welcome and the students for their professionalism and attentiveness throughout the argument. We also wish to recognize the exceptional briefing and argument provided by counsel for Lewis and the State.

As planned, Hale then went into the drug house followed later by Lewis and Mays, so that it would appear they were all there by happenstance. They all smoked and drank with Wilson and Rogers inside the house. Lewis was armed with a .38 special revolver, and Hale, who Lewis described as a violent person, was armed with a nine-millimeter firearm.

[8] Hale went upstairs to use the restroom and as he returned down the stairs, he stated "die bitch" and shot Wilson five times, including in his chest, abdomen, and back. *Trial Transcript* at 97. Rogers and Lewis both reached for a shotgun that was in the room, and Hale then turned out the lights and ordered Rogers to sit down. Hale told Lewis to kill Rogers, which Lewis refused to do. Lewis handed his revolver to Mays and stated, "if you want it … you do it." *Trial Transcript* at 304. Mays proceeded to brutally shoot Rogers multiple times, including several times in the head from a distance of six to eighteen inches. Lewis, Hale, and Mays collected the victims' drugs and money and ran to a nearby house, where they split up the proceeds of the robbery. Mays had taken the shotgun from the drug house also. Eventually, with Lawson's help, they arranged for a ride to a hotel. The men then hung out in the hotel room with Lawson and sat around laughing and talking about the shootings. At some point that night, Lewis engaged in sex or oral sex with Lawson at the hotel. Later, Lewis had his uncle bury the revolver that had been used to kill Rogers.

[9] The crime remained unsolved for quite some time, and Lewis lived in Arizona and Indiana over the next several years. He continued to be involved in drugs and crimes as a gang member until at least 2007. Between 2002 and 2006,

Lewis committed five misdemeanors (resisting law enforcement, driving without a license, and disorderly conduct (Indiana 2002); assault and unlawful imprisonment (Arizona 2005)) and three felonies (possession of cocaine (Indiana 2002), theft (Arizona 2004), and burglary (Arizona 2006)). Lewis violated probation more than once, and he was released to parole in Arizona in March 2011.

[10] In the meantime, investigators in Fort Wayne eventually identified Lewis as a suspect in the 1999 double murder. They located him in an out-of-state prison and interviewed him on May 21, 2009. Lewis gave a statement detailing his involvement with Hale and Mays in the robbery turned murder.[3]

[11] On February 25, 2011, the State charged Lewis with two counts of felony murder and two counts of robbery. He was arrested in Indiana on June 27, 2011. Jeffrey Raff, an experienced criminal defense attorney, represented Lewis throughout the trial proceedings. Lewis rejected plea offers from the State – contrary to Raff's recommendations – because Lewis could not grasp the concept of felony murder and believed he was not guilty of murdering Wilson and Rogers because he did not shoot either of them.

[12] The case proceeded to a jury trial on November 29-30, 2011. The jury found him guilty as charged. At the beginning of the sentencing hearing on January 5,

---

[3] Lewis had previously admitted his involvement in the crime during an interview with a Fort Wayne Police Detective in 2002, but no charges were filed at the time.

2012, Lewis made clear his dissatisfaction with Attorney Raff and his lack of desire to consult with Attorney Raff about sentencing issues. Thereafter, Attorney Raff presented no witnesses, made no argument on Lewis's behalf, and made no sentencing recommendation. He simply allowed Lewis to make his own statement, which spanned about six pages of the transcript. The State, on the other hand, presented a number of witnesses, asserted several aggravating circumstances, and asked the court to impose aggravated, consecutive sentences. At the conclusion of the sentencing hearing, the trial court imposed maximum sixty-five-year sentences for the felony murder convictions and ordered them to be served consecutively.[4] The trial court noted several aggravating circumstances (criminal history, gang membership, and the senseless, horrific nature of the offenses) and found no mitigating circumstances. In support of consecutive sentences, the trial court indicated that there were two victims and that Lewis had an aggravated criminal record.

[13] Lewis pursued a direct appeal with new counsel, Stanley Campbell. Attorney Campbell challenged the sufficiency of the evidence. We affirmed the convictions in a memorandum decision. *See Lewis v. State*, No. 02A03-1201-CR-18 (Ind. Ct. App. Aug. 31, 2012), *trans. denied*. We noted that all participants in a robbery that results in killing by one robber are deemed equally guilty of murder, regardless of which participant actually killed the victim. Based on the evidence presented at trial, we determined the "jury could have

---

[4] Judgments of conviction were not entered on the robbery counts.

reasonably inferred … that Lewis possessed the requisite intent to participate in the robberies, that he was an accomplice to the robberies and murders, and that the killings of Rogers and Wilson were probable and natural consequences of the actions of Lewis, Hale, and Mays." *Slip op*. at 7.

[14] On May 6, 2013, Lewis filed a pro se petition for post-conviction relief, which was amended by post-conviction counsel on October 31, 2016. An evidentiary hearing was held on July 7, 2017. Lewis argued that Attorney Raff failed to advocate on Lewis's behalf at sentencing, which resulted in Lewis receiving a de facto life sentence. Lewis argued that there were several available mitigating circumstances that should have been asserted at sentencing. Specifically, Lewis was eighteen when he committed the crimes, he acted as an accomplice, he has mental health issues, and he had a difficult upbringing. Additionally, Lewis claimed that Attorney Campbell was ineffective for failing to challenge the sentence as inappropriate on direct appeal.

[15] At the post-conviction hearing, Lewis called Attorney Raff and clinical psychologist Dr. James Cates as witnesses. He also testified on his own behalf and introduced several exhibits, including the affidavit of Attorney Campbell. The State acknowledged that Attorney Raff "basically did not do any advocacy at the sentencing hearing" but argued that "what Mr. Raff could have come up with would have had limited mitigating value and would probably not have made a difference in the outcome." *Post-Conviction Transcript* at 4.

[16]     The post-conviction court denied relief on March 15, 2018, with a lengthy order. The trial court made the following findings of fact regarding the evidence presented at the post-conviction hearing:

> 8. Attorney Raff did nothing at sentencing, other than to announce that Petitioner might speak on his own behalf. Attorney Raff testified at the post-conviction hearing, in relevant part, as follows. In preparation for Petitioner's sentencing, he would have reviewed Petitioner's criminal history, had personal contact with him, and reviewed the pre-sentence investigation report. He believed that no mitigators were available in this case. He made no inquiries about Petitioner's mental health history, and was not aware that Petitioner had attempted suicide at the Allen County Jail…. He did not ask Petitioner about his upbringing or his family members, did not speak to his relatives or friends, and did not have him examined by a mental health professional. He did not prepare Petitioner to make a statement at sentencing, and explained that Petitioner did not take his advice well. He would have asked whether any family members wanted to speak or write on Petitioner's behalf. Petitioner had a very poor character and very bad criminal history. He expected that Petitioner would receive consecutive sentences, one for each victim, of at least 55 years each. He could not identify any mitigators that he could argue with a straight face. He saw no indication that Petitioner had mental health issues, but rather "he just had a pretty extensive history of being a gangster basically." Young age could be a mitigator, but Petitioner was in his late 20s by the time of his sentencing, and "his criminal history negated any mitigator he might arguably have had because of his youth at the time of the offense." He suspected that a defendant's status as an accomplice had no weight as a mitigator. As to a defendant's difficult upbringing, Attorney Raff testified:
>
> > I was not of the school of thought that said that my client was not well treated when he was five or six, therefore that explains to some extent his robbing these people with a

gun. I think there's got to be some realistic relationship between the upbringing and the conduct.

Attorney Raff saw no nexus between any possible mitigating factor and anything in Petitioner's conduct and speech.

9. Attorney Campbell stated by affidavit, in relevant part, that his ability to challenge Petitioner's sentence was hindered by trial counsel's (Raff's) failure to present evidence and argument in favor of a mitigated sentence; Attorney Campbell would have challenged the sentence as inappropriate under Indiana Appellate Rule 7(B) if Attorney Raff had made a record at sentencing regarding Petitioner's mental health issues and troubled family background; the sufficiency of evidence argument was not a strong issue, and the Appellate Rule 7(B) challenge would have been a stronger issue, particularly if a record had been developed at sentencing.

10. Psychologist James A. Cates, Ph.D., testified at the post-conviction hearing, in relevant part, as follows. He interviewed Petitioner in 2016 and administered several psychological tests …. He learned that Petitioner's mother was a drug abuser, she had abusive men in the home, and she was diagnosed with bipolar disorder; that Petitioner was physically abused by his mother and her boyfriends; and that his housing situation was unstable. Dr. Cates diagnosed Petitioner with "bipolar II disorder" and noted that he also exhibited antisocial personality traits. Dr. Cates was the first clinician who formally diagnosed Petitioner with bipolar disorder…. "Bipolar II" is a slightly less severe degree of bipolar disorder than "bipolar I," not involving any reported full manic episodes. Bipolar disorder is not always apparent, and indeed people with that disorder "can go through periods where their mood is absolutely stable." Dr. Cates believed that, at the time of the murder, Petitioner was likely already experiencing distorted logic and decision-making from bipolar disorder. The effect of bipolar disorder upon Petitioner's

behavior around the time of the crime would depend on whether he was in a depressed phase or a hypomanic/manic phase, but there were several possibilities:

> [Y]ou could potentially see increased impulsivity, you could see increased disruption in his thought processes, his ability to think through the consequences of actions. You could see … auditory/visual hallucinations, you could see delusions, all those are potential.

Petitioner had had a substance abuse problem, which could have resulted from efforts at self-medication for bipolar disorder. Consistent with the diagnosis of bipolar disorder, Petitioner's medical records from the Arizona Department of Corrections indicated that he was prescribed mood-stabilizing drugs. At the time of the crime, Petitioner's "maturity level was probably much younger than his chronological age would suggest." Numerous children who live in traumatized situations do not evidence a conduct disorder. Up to the age of 18, around the time of the offense, Petitioner had displayed no conduct disorder. During the time when Petitioner was admittedly a gang member, from the ages of 13 to 26, he would have been more likely to derive his values from the gang, rather than anything in society that might have been opposed to the gang's values.

11. Relatives of Petitioner stated by affidavit, in relevant part, that his mother was addicted to drugs; his father was mostly absent and did not help to raise him; he had an unstable home life; he and his mother were physically abused by the mother's boyfriends; at the age of nine, he witnessed one boyfriend stabbing another; he began using and selling drugs at an early age; members of his family suffer from mental illnesses including bipolar disorder, schizophrenia, depression, and substance abuse disorder; his mother has been diagnosed with bipolar disorder and is deemed "seriously mentally ill" by the State of Arizona; and he tried to commit suicide in his late teens.

12. Petitioner testified at the post-conviction hearing, in relevant part, as follows. He and Attorney Raff never discussed a plan or evidence for sentencing. Attorney Raff never asked him about his mental health history or his family and personal background, and did not discuss having anyone speak on his behalf at sentencing. He told the probation officer who prepared his pre-sentence investigation report (PSI) that he did not have mental health issues (although he had been diagnosed with bipolar disorder) because he was nervous and scared. However, if Attorney Raff had asked him about his mental health, of course he would have told him about the previous treatment. Attorney Raff did not prepare him to speak at sentencing, and he did not meet with him between the time he was convicted and the time he was sentenced. He was admitted twice to Parkview Behavioral Health in 2002, and was first told that he had bipolar disorder while in the Arizona Department of Correction in 2004 or 2005. He attempted suicide in the Allen County Jail in 2002.

*Appendix Vol. III* at 30-34 (citations to record omitted).

[17] In its conclusions, the post-conviction court addressed each of the potential mitigating circumstances and determined that Attorney Raff erred in certain regards. Regardless, the court concluded that Lewis was not prejudiced by the alleged deficient performance because "[e]ven if Attorney Raff had done everything that Petitioner now wishes he had done, there would have been little or (more likely) no effect on the sentence." *Id*. at 41. The post-conviction court's conclusions will be set out more fully below, but it ultimately concluded, based on lack of prejudice, that Lewis did not receive ineffective assistance of trial or appellate counsel. Additionally, the post-conviction court rejected Lewis's argument, based on *U.S. v. Cronic*, 466 U.S. 648 (1984), that he did not

have to establish prejudice. Lewis now appeals the denial of his petition for post-conviction relief.

## Standard of Review

In a post-conviction proceeding, the petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Bethea v. State*, 983 N.E.2d 1134, 1138 (Ind. 2013). "When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id*. (quoting *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004)). In order to prevail, the petitioner must demonstrate that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*. Although we do not defer to a post-conviction court's legal conclusions, we will reverse its findings and judgment only upon a showing of clear error, *i.e.*, "that which leaves us with a definite and firm conviction that a mistake has been made." *Id*. (quoting *Ben–Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000)).

A petitioner will prevail on a claim of ineffective assistance of counsel upon a showing that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the petitioner. *Id.* To satisfy the first element, the petitioner must demonstrate deficient performance, which is "representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *Id*. (quoting *McCary v.*

*State*, 761 N.E.2d 389, 392 (Ind. 2002)). The second element requires a showing of prejudice, which is "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id*. at 1139. "A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Kubsch v. State*, 934 N.E.2d 1138, 1147 (Ind. 2010) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Because a petitioner must prove both deficient performance and prejudice to prevail on a claim of ineffective assistance of counsel, the failure to prove either element defeats such a claim. *See Young v. State*, 746 N.E.2d 920, 927 (Ind. 2001).

## Trial Counsel's Effectiveness

[20] Undoubtedly, Attorney Raff was deficient in his representation of Lewis at the sentencing hearing. Lewis faced a maximum sentence of 130 years, essentially a life sentence. Although present, Attorney Raff did nothing for his client at sentencing aside from indicate that Lewis would speak on his own behalf at the conclusion of the hearing. Lewis argues that at a minimum Attorney Raff should have proffered several mitigating circumstances and argued against maximum, consecutive sentences.[5] *See McCarty v. State*, 802 N.E.2d 959, 969

---

[5] In sum, Lewis asserts that "[i]nstead of humanizing Lewis and presenting evidence of his difficult upbringing, his youth, and his mental illness and substance addiction, [Attorney] Raff displayed rancor toward [Lewis]." *Appellant's Brief* at 28. Lewis continues: "[Raff's] comments during closing argument that his client was a disgusting and bad person with a disgusting lifestyle, coupled with his silence at sentencing, betrayed his duty of loyalty to his client and left the jury and sentencing court with a horrible impression of Lewis." *Id*. Moreover, Lewis observes that it was the trial court's duty to determine the weight of proffered mitigating circumstances, making Attorney Raff's decision to unilaterally remove available mitigators from consideration improper. "While Raff had the discretion to weed out weaker arguments from stronger ones,

(Ind. Ct. App. 2004) (concluding, in a multiple-felony case, that "[c]ounsel's failure to investigate and present to the court numerous potentially mitigating circumstances constituted deficient performance"), *trans. denied*. Although we agree that trial counsel was deficient, our review leaves us with the firm conviction that Lewis was not prejudiced by counsel's deficient performance. In this regard, we address each potential mitigating circumstance below.

## Role as Accomplice

Lewis contends that his role as an accomplice in the murders was both relevant and mitigating. Our Supreme Court has observed:

> While an accomplice may be found guilty of the crime largely executed by his principal, it does not follow that the same penalty is appropriate. Justice Frankfurter has written, "[T]here is no greater inequality than the equal treatment of unequals." *Dennis v. United States*, 339 U.S. 162, 184, 70 S.Ct. 519, 526, 94 L.Ed. 734, 749 (1949) (dissenting opinion).

*Martinez Chavez v. State*, 534 N.E.2d 731, 735 (Ind. 1989); *see also Brown v. State*, 10 N.E.3d 1, 5 (Ind. 2014) (revising inappropriate sentence from 150 years to 80 years in part because defendant acted as an accomplice in murders).

Although Lewis acted as an accomplice, the evidence establishes that his role in the murders was substantial and that he was actively involved before, during, and after the horrific murders of a fourteen-year old and sixteen-year old.

his silence communicated to the court that there were no possible mitigators and that his client deserved the maximum sentence." *Appellant's Reply Brief* at 5.

Before, Lewis planned the robbery of two young drug dealers with Hale and Mays. He took his own gun to the robbery and was aware that Hale, a person he knew to be violent, was armed with a gun. During the crime, as Wilson was being shot, Lewis reached for the shotgun to keep it away from Rogers. Lewis also handed his own gun to Mays, who was unarmed, and invited him to shoot Rogers if he wished. Mays proceeded to shoot Rogers in the head multiple times from a close distance. After, Lewis fled with his cohorts, taking the shotgun with him. The three divided the drugs and money and then spent the night in a hotel essentially celebrating and laughing about the evening's events. Considering the totality of his involvement, we agree with the trial court that Lewis's role as an accomplice was not deserving of mitigating weight.

## Age

[23] The murders were committed shortly after Lewis turned eighteen years old. He argues that his age, "while not legally excusing his behavior, was relevant to contextualize his behavior during and after the crime occurred." *Appellant's Brief* at 25.

[24] In addressing the appropriateness of a sixteen-year-old defendant's 150-year sentence in *Brown*, the Supreme Court stated:

> We take this opportunity to reiterate what the United States Supreme Court has expressed: Sentencing considerations for youthful offenders – particularly for juveniles – are not coextensive with those for adults. *See Miller v. Alabama*, [567] U.S. [460], [480,] 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012) (requiring the sentencing judge to "take into account how

children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" (footnote omitted)). Thus, both at initial sentencing and on appellate review it is necessary to consider an offender's youth and its attendant characteristics.

*Brown*, 10 N.E.3d at 6-7.

[25] Though not identified as a statutory mitigating circumstance, it is well established that a defendant's youth may be a significant mitigating factor in some circumstances. *See Smith v. State*, 872 N.E.2d 169, 178 (Ind. Ct. App. 2007), *trans. denied*.

> Focusing on chronological age is a common shorthand for measuring culpability, but for people in their teens and early twenties it is frequently not the end of the inquiry. There are both relatively old offenders who seem clueless and relatively young ones who appear hardened and purposeful.

*Ellis v. State*, 736 N.E.2d 731, 736 (Ind. 2000).

[26] The record shows that Lewis was not a clueless eighteen-year-old. By his own admission, he had been a gang member for several years before the crime. He actively planned and participated in the robbery turned double murder and seemed unaffected by the horrific results. Further, any diminished culpability due to his age is overshadowed by his continued involvement in criminal conduct and gang life for many years thereafter. Any weight given this mitigator would be exceedingly minimal under the circumstances.

### Difficult Childhood

With minimal investigation, Lewis argues that Attorney Raff would have learned of additional mitigating evidence, including his difficult childhood. In this regard, Lewis presented evidence at the post-conviction hearing that he was raised by a drug-addicted mother who suffers from bipolar disorder and has been deemed seriously mentally ill by the State of Arizona. Lewis was physically abused by his mother's boyfriends and, at the age of nine, he witnessed one boyfriend stabbing another. Lewis began using and selling drugs at an early age and eventually dropped out of school and took to the streets.

Our Supreme Court has indicated that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Coleman v. State*, 741 N.E.2d 697, 700 (Ind. 2000) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). Evidence of a difficult childhood, however, generally "warrants little, if any, mitigating weight." *Id*.

### Mental Health

The final mitigating factor advanced by Lewis at the post-conviction hearing was his mental illness. Specifically, Lewis had attempted suicide, was treated with mood-stabilizing drugs while incarcerated in Arizona, and has suffered from substance abuse and bipolar disorder. Dr. Cates opined that, at the time

of the murders, Lewis may have been experiencing distorted logic and decision making, and his maturity level was likely much younger than his actual age.

[30]  Several factors bear on the weight, if any, that should be given to mental illness at sentencing.

> These factors include: (1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission of the crime.

*Weeks v. State*, 697 N.E.2d 28, 30 (Ind. 1998). Here, Dr. Cates diagnosed Lewis in 2016 with Bipolar II, a less-severe form of the disorder. There is no evidence that Lewis was suffering from this disorder in 1999, which makes establishing a nexus between the crime and Lewis's mental state rather difficult. The extent to which Lewis would have been unable to control his behavior due to the disorder is similarly unclear, and his behavior before, during, and after the murders suggests that he was in control of his faculties. The weight attributable to this mitigator, if any, would have been extremely low under the circumstances.

## Consecutive Sentences

[31]  Additionally, Lewis argues that Attorney Raff should have argued against consecutive sentences in light of the available mitigating circumstances. Lewis does not dispute that the aggravating circumstance of multiple victims generally suffices to support consecutive sentences. Indeed, "when the perpetrator

commits the same offense against two victims, enhanced and consecutive sentences seem necessary to vindicate the fact that there were separate harms and separate acts against more than one person." *Serino v. State*, 798 N.E.2d 852, 857 (Ind. 2003).

[32]     Lewis notes that consecutive sentences, however, are not always required where there are multiple murder victims. For example, in *Holsinger v. State*, 750 N.E.2d 354 (Ind. 2001), the Court reversed a sentence of two consecutive sentences of life in prison without parole after finding several sentencing errors. The Court chose to resentence the defendant with an independent consideration of the aggravating and mitigating factors. In mitigation, the Court observed that the defendant was nineteen when he participated in the murders (and robberies), he had a troubled childhood, his co-defendant was the instigator/leader of the criminal episode, and he had no juvenile or criminal history. *Id.* at 363-64. Despite finding that the "aggravating circumstances outweighed the mitigating circumstances by a sufficient magnitude that the maximum sentence of 65 years for murder should be imposed on each count", the Court ordered the sentences on the two murder counts to be served concurrently. *Id.* at 365; *see also Brown*, 10 N.E.3d at 4-8 (revising inappropriate sentence from 150 years to 80 years for two counts of murder and one count of robbery where defendant was only 16 years old, was an accomplice/not the mastermind, the murders were not particularly heinous, and defendant's only violent juvenile offense was a battery).

[33] Although consecutive sentences are not always a given when there are multiple murder victims, concurrent sentences are undoubtedly the exception. We cannot agree with Lewis that the facts of this case lend themselves to making concurrent sentences appropriate. As discussed above, although Lewis was relatively young and acted as an accomplice, his culpability was great. Moreover, unlike in *Brown*, these murders were particularly heinous. The victims were fourteen and sixteen years old and were each shot multiple times in senseless acts of violence. In fact, Lewis callously provided the murder weapon to Mays for the purpose of killing Rogers if Mays wanted to. After leaving the victims to die,[6] the trio, along with Lawson, partied into the night and laughed about their crimes. In addition to the nature and circumstances of the murders, we find relevant Lewis's substantial criminal behavior in the subsequent years and his continued association with Hale and Mays.

## Prejudice

[34] The post-conviction court determined that even if Attorney Raff had done everything that Lewis now wishes he had done, "there would have been little or (more likely) no effect on the sentence." *Appendix Vol. III* at 41. The court noted that consecutive sentences were supported by the aggravating circumstance of multiple victims, the second of which was killed after Lewis handed his gun to Mays. The court opined, "it is inconceivable that Attorney

---

[6] The evidence at trial indicated that one of the victims was still alive for a period of time after being shot and he moved around the house, leaving a trail of blood.

Raff could have presented any evidence or argument that would have altered the Court's decision" regarding consecutive sentences. *Id.* The court continued:

> [I]t is at least conceivable that Attorney Raff could have obtained an aggregate sentence of less than 130 years (but at least 110 years) for Petitioner by presenting mitigating evidence. In view of the weakness of the available mitigating evidence, however, there is no reasonable probability that Petitioner would have received a sentence of less than 130 years. There would have been no basis for an argument that Petitioner's participation as an accomplice was entitled to any mitigating weight. His age of 18 at the time of the offense would have lost all or most of the limited significance it did possess in view of his age of 30 at the time of sentencing. His difficult childhood would have warranted "little, if any, mitigating weight", particularly in view of the lack of evidence connecting his bad childhood with his later decision to take part in an armed robbery. His bipolar disorder, also not shown to have any nexus with his crimes, would likewise have deserved little weight, if any, as a mitigating factor. Although the Court would have had discretion to give some modest weight to these claimed mitigators, and accordingly to impose an aggregate sentence slightly below the maximum possible, there is no reasonable probability that the Court would actually have done so under the circumstances of Petitioner's case. *See Taylor v. State*, 840 N.E.2d 324, 331 (Ind. 2006), quoting *Strickland*, 466 U.S. at 687 (a "reasonable probability" is a probability "sufficient to undermine confidence in the outcome"). Petitioner's defense therefore did not suffer prejudice from Attorney Raff's failure to present mitigating evidence and argument at sentencing.

*Appendix Vol. III* at 41-42 (some citations omitted).

[35] "The dispositive question in determining whether a defendant is prejudiced by counsel's failure at sentencing to present mitigating evidence is what effect the totality of the omitted mitigation evidence would have had on the sentence." *McCarty*, 802 N.E.2d at 967 (citing *Coleman*, 741 N.E.2d at 702). Thus, on review, we determine whether there is a reasonable probability that the trial court would have imposed a lesser sentence had it been fully informed of the mitigating evidence. *McCarty*, 802 N.E.2d at 969.

[36] We agree with the post-conviction court that there is not a reasonable probability that presentation of the omitted mitigating evidence would have affected Lewis's sentence. While Attorney Raff certainly should have proffered the mitigators at sentencing, the meager weight of those simply could not withstand the overwhelming weight of the aggravating circumstances. Without recounting everything above, we observe that this was a senseless and horrific crime, resulting in the death of two teenage boys, and Lewis, an active participant at all stages, seemed to be unfazed by his involvement in the killings. For at least the next eight years, Lewis continued his criminal behavior and was convicted in both Arizona and Indiana of several felonies and misdemeanors.[7] Although Lewis gave a detailed statement to detectives, he never grasped that he was culpable for the killings and his statement at sentencing was not

---

[7] Lewis reported that his role in the Gangster Disciples, of which he was a member from age thirteen to age twenty-six, was "selling drugs, robbing people, and beating people up." *Post-Conviction Exhibits* at Petitioner's Exhibit B (PSI report).

reflective of true remorse. The post-conviction court's determination regarding lack of prejudice was not clearly erroneous.

## U.S. v. Cronic

[37] Lewis argues that this is a rare case in which prejudice is presumed due to trial counsel's effective abandonment of his client during a critical stage in the proceedings. This argument is based on *U.S. v. Cronic*, 466 U.S. 648 (1984).

[38] In *Cronic*, the U.S. Supreme Court identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658-659. First and "[m]ost obvious … is the complete denial of counsel" at a critical stage of trial. *Id.* at 659. Secondly, the Court noted "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* Finally, the Court included cases "where counsel is called upon to render assistance under circumstances where competent counsel very likely could not". *Bell v. Cone*, 535 U.S. 685, 696 (2002) (citing *Cronic*, 466 U.S. at 659-662).

[39] Lewis argues that his claim fits within the second exception identified in *Cronic* because counsel failed to subject the State's case to meaningful adversarial testing at the sentencing hearing. We do not agree that Lewis's claim is controlled by *Cronic* rather than *Strickland*.

[40]   The U.S. Supreme Court has emphasized the narrowness of *Cronic's* exceptions.

> The Court has relieved defendants of the obligation to make this affirmative showing [of prejudice] in only a very narrow set of cases in which the accused has effectively been denied counsel altogether:  These include the actual or constructive denial of counsel, state interference with counsel's assistance, or counsel that labors under actual conflicts of interest.

*Weaver v. Massachusetts*, 137 S. Ct. 1899, 1915, 198 L. Ed. 2d 420 (2017); *see also Kimmelman v. Morrison*, 477 U.S. 365, 382 n.6 (1986) (noting the "few contexts" where prejudice is presumed are "where counsel is either totally absent or prevented from assisting the accused during a critical stage of the proceeding" and "where counsel is burdened by an actual conflict of interest").

[41]   *Strickland* and *Cronic* were issued the same day, and *Strickland* also addressed the concept of presuming prejudice in certain contexts:

> Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.  So are various kinds of state interference with counsel's assistance.  Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost.  Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.[8]

---

[8] Similarly, in discussing the second exception in *Cronic*, the Court cited a case in which defense counsel was precluded by a protective order from effectively cross examining a key prosecution witness.  *Cronic*, 466 U.S. at 659 (citing *Davis v. Alaska*, 415 U.S. 308 (1974)).  Because this was a "constitutional error of the first magnitude", no showing of lack of prejudice could cure it.  *Id.* (quoting *Davis*, 415 U.S. at 318).  The Court

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. [P]rejudice is presumed when counsel is burdened by an actual conflict of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."
>
> Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. The government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence.

*Strickland*, 466 U.S. at 692-93 (citations omitted).

[42] Moreover, since *Cronic* was decided in 1984, the U.S. Supreme Court has never applied the second exception to relieve a convicted defendant of the need to prove prejudice, nor has the Indiana Supreme Court.[9] In *Bell*, the Court simply spoke of "the *possibility* of presuming prejudice based on an attorney's failure to test the prosecutor's case" where the attorney's failure is complete. *Bell*, 535

---

observed: "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id*. at 659 n. 26.

[9] We acknowledge that the Seventh Circuit has applied the second *Cronic* exception in cases similar to Lewis's. *See Miller v. Martin*, 481 F.3d 468, 472 (7th Cir. 2007); *Patrasso v. Nelson*, 121 F.3d 297, 303-05 (7th Cir. 1997). These decisions, however, are not binding upon us. *See Ind. Dep't of Public Welfare v. Payne*, 622 N.E.2d 461, 468 (Ind. 1993) ("Although U.S. Supreme Court decisions pertaining to federal questions are binding on state courts, lower federal court decisions may be persuasive but have non-binding authority on state courts.").

U.S. at 696-97 (emphasis supplied). Ultimately, the Court concluded in *Bell*: "The aspects of counsel's performance challenged by respondent – the failure to adduce mitigating evidence and the waiver of closing argument – are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components." *Id.* at 697-98.

[43] We are not persuaded that Lewis's claim falls within one of the limited circumstances of extreme magnitude that justify a presumption of ineffectiveness under *Cronic*.[10] The post-conviction court, therefore, correctly determined that Lewis was required to establish prejudice under *Strickland*.

### Appellate Counsel's Effectiveness

[44] Briefly, Lewis also argues that his appellate counsel, Attorney Campbell, was ineffective for failing to challenge his sentence as inappropriate on direct appeal. Deficient performance will be found where the unraised issue on appeal was "significant and obvious from the face of the record" and was "clearly stronger" than the issue raised. *Timberlake v. State*, 753 N.E.2d 591, 606 (Ind. 2001). A reviewing court, however, "should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts

---

[10] We note that Attorney Raff's lack of advocacy at the sentencing hearing appears to have been, at least in part, invited by Lewis, who expressed clear disdain for counsel. Lewis, a difficult, angry client, indicated at the sentencing hearing, "I really don't want to discuss nothin' with Jeffrey Raff any further." *Sentencing Transcript* at 5. In preparing for the sentencing hearing, Attorney Raff determined (incorrectly) that there were no mitigating circumstances that he could present to the trial court. He believed "the only hope [for Lewis] was to make an expression of remorse". *Post-Conviction Transcript* at 15. In this vein, Lewis gave a lengthy statement at sentencing. The statement, however, veered off from any true expression of remorse.

of the case and the precedent available to counsel when that choice was made." *Bieghler v. State*, 690 N.E.2d 188, 194 (Ind. 1997). If deficient performance is established, we then examine whether the issue that appellate counsel failed to raise would have been clearly more likely to result in reversal or an order for a new trial. *Id*.

[45] Attorney Campbell acknowledged that the sufficiency argument presented on direct appeal was not a strong issue and that a challenge to the sentence would have been a stronger issue *if* the record had been properly developed at the sentencing hearing. Attorney Campbell, however, felt that his hands were tied by Attorney Raff's failure to proffer any mitigating circumstances below. Had Attorney Raff made a proper record, Attorney Campbell averred that he would have challenged the 130-year sentence as inappropriate. Additionally, Attorney Campbell believed that challenging the sentence on direct appeal with an undeveloped record might hinder Lewis's ability to pursue a post-conviction claim of ineffective assistance of trial counsel. Attorney Campbell's assessment of the sentencing issue and determination not to raise it on direct appeal were reasonable and did not constitute deficient performance.

[46] Judgment affirmed.

Riley, J. and Bradford, J., concur.