In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1642

RODERICK V. LEWIS,

*Petitioner-Appellant,*

*v.*

DUSHAN ZATECKY,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-01515-RLY-MPB — **Richard L. Young**, *Judge.*

ARGUED SEPTEMBER 30, 2020 — DECIDED APRIL 13, 2021

Before SYKES, *Chief Judge*, and WOOD and BRENNAN, *Circuit Judges*.

WOOD, *Circuit Judge*. When has a client charged with a serious crime received not merely inadequate assistance of counsel, but a failure of representation so serious that "counsel has entirely failed to function as the client's advocate"? *Florida v. Nixon,* 543 U.S. 175, 189 (2004). This is the situation the Supreme Court first addressed in *United States v. Cronic*, 466 U.S. 648 (1984). Although such a total breakdown is rare,

the Court has never wavered from the recognition that it can occur. In such cases, unlike those presenting more conventional ineffective-assistance claims, the defendant does not need to make an independent showing of prejudice. See *Strickland v. Washington*, 466 U.S. 668 (1984). The failing is so profound that prejudice is inherent in the situation.

In the case before us, Roderick Lewis argues that his is one of the extraordinary cases to which the *Cronic* rule applies. Standing convicted of felony murder, he received literally no assistance from his lawyer during the sentencing stage of the trial. After proceedings in the state courts, which we detail below, he turned to federal court and filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied relief, but it issued a certificate of appealability to Lewis. We conclude that the decision of the last responsible state court was contrary to Supreme Court precedent, insofar as it held that *Strickland*, not *Cronic*, furnished the applicable rule, and it was an unreasonable application of *Cronic*, insofar as it focused on that case.[1] We thus reverse and remand for issuance of the writ, limited to sentencing.

---

[1] In order to be fair to the state court, we consider its decision under each of the two distinct branches of section 2254(d)(1), as courts commonly do. See, *e.g.*, *Aki-Khuam v. Davis*, 339 F.3d 521, 529 (7th Cir. 2003) ("… it is clear that the state trial court proceedings, and the state supreme court review thereof, resulted in a decision contrary to, and involving an unreasonable application of, federal law as determined by the United States Supreme Court[.]"); *Bailey v. Rae*, 339 F.3d 1107, 1118–19 (9th Cir. 2003) (state court's application of a standard "is 'contrary to' clear Supreme Court precedent[] [and] [t]he state court's denial of the *Brady* claim was also objectively 'unreasonable'[.]"); *Pazden v. Maurer*, 424 F.3d 303, 306 (3d Cir. 2005) (the state court's determination "was both contrary to, and an unreasonable application of, clearly established law as proclaimed by the

# I

## A

We take our account of the underlying facts from the second opinion of the Court of Appeals of Indiana, the last state court to consider this case. See *Lewis v. State* (*Lewis II*), 116 N.E.3d 1144 (Ind. Ct. App. 2018). That court in turn relied on the facts it had reported on direct appeal, see *Lewis v. State*(*Lewis I*), 973 N.E.2d 110 (Table), (Ind. Ct. App. 2012), but we can largely disregard that detail.

The case involved a toxic mixture: drugs, robbery plans, guns, and immaturity. Richard Rogers, then 16 years old, ran a drug house in Fort Wayne, Indiana, with Sidney Wilson, 14 years old. On June 29, 1999, Rogers invited Christopher Hale to visit the drug house, but Hale declined because of tensions with Wilson. Later that evening, Hale, petitioner Roderick Lewis, and Kajuanta Mays came up with a plan to rob Rogers and Wilson of both drugs and money. They first confirmed that Rogers and Wilson were alone by sending Angela

---

Supreme Court."); *Fratta v. Quarterman*, 536 F.3d 485, 502–03 (5th Cir. 2008) ("The district court was thus correct in determining that the CCA's decision was contrary to, and involved an unreasonable application of, clearly established federal law."); *Breakiron v. Horn*, 642 F.3d 126, 139 (3d Cir. 2011) (the state court's ruling "is both contrary to and an unreasonable application of *Strickland*."); *Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 285 (3d Cir. 2016) ("We conclude…that the [state court]'s decision … rested on … unreasonable applications of clearly established law, or were contrary to United States Supreme Court precedent."); *Rivera v. Thompson*, 879 F.3d 7, 16–17 (1st Cir. 2018) ("[W]e conclude that … the [state court]'s holding was contrary to governing Supreme Court law[.] … Thus, the [state court]'s conclusion 'involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States.'").

Lawson to the house to buy drugs. Hale then showed up, followed by Lewis and Mays. The group smoked and drank together. Two of them were armed: Lewis had a .38 special revolver, and Hale had a 9 mm firearm.

At one point Hale went upstairs. When he returned, he said "die bitch" and shot Wilson five times, killing him. Rogers and Lewis then each reached for a shotgun. Hale told Lewis to kill Rogers, but Lewis refused, instead handing his revolver to Mays and saying, "if you want it … you do it." Mays did not hesitate: he shot Rogers multiple times, fatally. Lewis, Hale, and Mays then collected the drugs and money and fled. They wound up in a hotel where they laughed and partied through the night. Later, Lewis had his uncle bury the murder weapon.

For the next few years, the crime remained unsolved and Lewis traveled around the country, living in Arizona and Indiana. Ultimately, however, investigators in Fort Wayne identified him as a suspect in the 1999 murders. They found him in a prison in May 2009 and interviewed him; on February 25, 2011, the State of Indiana charged him with two counts of felony murder and two counts of robbery. He was arrested on June 27, 2011.

B

At trial, Lewis was represented by Attorney Jeffrey Raff. Raff tried to get Lewis seriously to consider some plea offers, but Lewis was uninterested, perhaps because he did not understand the concept of felony murder and thought that, because he did not shoot either Wilson or Rogers, he was not guilty. If that was his impression, he was mistaken. The jury found Lewis guilty as charged.

The problems that bring Lewis before us today arose at the sentencing phase. Here is how the Indiana Court of Appeals described Raff's assistance to Lewis at that critical point:

> "Judge I'm going to defer to Mr. Lewis if he has any comments. I don't have anything to add." *Sentencing Transcript* at 23–24. This is the sum total of trial counsel's participation at Lewis's sentencing hearing, at which Lewis was being sentenced for two counts of felony murder and faced a maximum sentence of 130 years in prison. The trial court found no mitigating circumstances—none being asserted by the defense—and sentenced Lewis to the maximum aggregate sentence of 130 years in prison.

*Lewis II*, ¶ 1. Represented by new counsel, Lewis took a direct appeal, but it was unsuccessful. See *Lewis I.* Acting pro se, Lewis then filed a post-conviction petition in the state court in 2013. Post-conviction counsel amended that petition in October 2016, and the court held an evidentiary hearing on July 7, 2017.

Lewis called Attorney Raff, among others, to testify at that hearing. The state conceded that Raff "basically did not do any advocacy at the sentencing hearing" but argued that he could not have made a difference anyway. Raff himself testified about his normal procedures for preparing for a sentencing hearing. He also described quite a few things that he did *not* do:

> He made no inquiries about Petitioner's mental health history, and was not aware that Petitioner had attempted suicide at the Allen County Jail. … He did not ask Petitioner about his upbringing or his family

> members, did not speak to his relatives or friends, and
> did not have him examined by a mental health profes-
> sional. He did not prepare Petitioner to make a state-
> ment at sentencing, and explained that Petitioner did
> not take his advice well.

*Lewis II*, ¶ 16, quoting from the post-conviction court's find-
ings of fact. Essentially Raff thought that Lewis was a hope-
less cause, and so there was nothing useful Raff could do.
Other witnesses at the post-conviction hearing spoke about
evidence that might have had an impact at sentencing, includ-
ing a psychologist who diagnosed Lewis with bipolar II dis-
order and discussed his associated substance-abuse problem,
physical abuse by his mother's boyfriends, mental disorders
in other family members, and his attempted suicide. None of
this, it bears repeating, was brought out during the sentencing
stage of the trial.

On state post-conviction review, the state appellate court
"agree[d] with Lewis that trial counsel's performance at sen-
tencing was clearly deficient." *Lewis II*, ¶¶ 4, 20. Nevertheless,
the court held that "our review leaves us with the firm con-
viction that Lewis was not prejudiced by counsel's deficient
performance." *Id.* ¶ 20. It reviewed the following potential
mitigating circumstances: Lewis's role as an accomplice; his
age; his difficult childhood; and his mental health. None of
these could have supported a finding of prejudice, in the
court's view, nor was it troubled by his consecutive sentences.

Finally, the court turned to the issue that has survived to
reach us: whether the proper standard for assessing Lewis's
case comes from *Cronic*, as Lewis argues, or *Strickland*. If it is
*Strickland*, then Lewis's case is over: we cannot say that the
Indiana Court of Appeals was unreasonable when it found

that Lewis had not been *prejudiced* by his attorney's substandard performance. (We add that we are not necessarily saying that we would have resolved the prejudice issue the same way. We mean only that we are satisfied that the state court acted within the generous boundaries delineated for it by 28 U.S.C. § 2254(d)(1).) If *Cronic* applies, however, then matters are quite different, because prejudice need not be shown. But the state court found that Lewis's case did not fit within the *Cronic* framework. *Lewis II*, ¶ 39. Its finding of no prejudice for *Strickland* purposes required it to affirm the trial court's denial of post-conviction relief.

After exhausting his state-court remedies, Lewis filed a petition under 28 U.S.C. § 2254 in the federal court. The district court acknowledged that in *Miller v. Martin*, 481 F.3d 468 (7th Cir. 2007), this court had found that the Indiana court had unreasonably failed to apply *Cronic* to an attorney's performance at sentencing, and thus that petitioner Miller was entitled to the issuance of a writ of habeas corpus. *Id.* at 470. But, the court thought, *Miller* had been undermined by two decisions of the U.S. Supreme Court: *Wright v. Van Patten*, 552 U.S. 120 (2008), and *Woods v. Donald*, 575 U.S. 312 (2015). It characterized what happened in Lewis's case as counsel's complete failure to subject the prosecution's case to adversarial testing, and it then concluded that no Supreme Court decision squarely addressed that situation. It thus concluded that the criteria for the issuance of a writ were not met. But the court also recognized that "[r]easonable jurists could disagree about whether *Cronic* clearly establishes an exception to *Strickland*'s prejudice requirement" on these facts, and so it issued a certificate of appealability to Lewis limited to this issue.

## II

We begin with a review of the Supreme Court's *Cronic* decision and how it fits within the broader context of ineffective-assistance-of-counsel cases. For purposes of section 2254(d), the only relevant law is that which is "clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). Our own decisions, as well as those of other circuits or state courts, are informative only insofar as they may shed light on our understanding of the authoritative Supreme Court precedents.

1. *Cronic*

The underlying facts of *Cronic* involved a common check-kiting scheme, in which defendant Cronic and his co-defendants relayed checks back and forth between two bank accounts (one in Tampa, Florida, and the other in Norman, Oklahoma) in order to create falsely inflated balances in each one. They ran almost $4.8 million through the Tampa bank and $4.6 million through the Norman bank. They ultimately were caught and indicted on federal mail-fraud charges.

Cronic was initially represented by one lawyer, but shortly before trial, that lawyer withdrew from the case. In his place, "[t]he court appointed a young lawyer with a real estate practice" to represent Cronic. It allowed the substitute lawyer only 25 days to prepare for trial, even though the government had been working for over four and a half years on the case and "had reviewed thousands of documents." 466 U.S. at 649. Cronic's co-defendants agreed to testify for the government.

Despite these disadvantages, Cronic's lawyer managed to do a few things. He was able to establish some points favorable to Cronic on cross-examination. He did not, however, put

on any defense. In the end, Cronic was convicted on most
counts of the indictment and sentenced to 25 years' imprison-
ment. His trial lawyer filed a timely appeal for him, although
two months later Cronic filed a motion asking that a new law-
yer be appointed for the appeal.

The court of appeals obliged him, though it declined to ap-
point the lawyer Cronic had requested. It reversed Cronic's
conviction on the basis of several factors: the limited time for
investigation and preparation, counsel's lack of experience,
the gravity of the charge, the complexity of possible defenses,
and counsel's access to witnesses. The Supreme Court re-
versed. *Id.* at 667.

The Court began its analysis by reiterating the critical role
that counsel plays in the criminal justice system and the con-
sequent need to assure counsel's competence:

> The right to the effective assistance of counsel is thus
> the right of the accused to require the prosecution's
> case to survive the crucible of meaningful adversarial
> testing.

*Id.* at 656. It then reaffirmed the general rule, under which
"[a]bsent some effect of challenged conduct on the reliability
of the trial process, the Sixth Amendment guarantee is gener-
ally not implicated." *Id.* at 658.

That said, the Court then spelled out some "circumstances
that are so likely to prejudice the accused that the cost of liti-
gating their effect in a particular case is unjustified." *Id.* It sin-
gled out the following examples:

- The complete absence of counsel at a critical stage
  of the trial. *Id.* at 659.

- Counsel's total failure to subject the prosecution's case to meaningful adversarial testing. *Id.*

- Other circumstances under which, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659–60.

The Court concluded that Cronic had not suffered from an extreme deprivation along the lines of its examples, and so he could prevail only if he could identify specific errors that trial counsel made. *Id.* at 666. That issue, the Court held, could be explored on remand.

In the years since it was decided, *Cronic* has made few appearances in Supreme Court opinions. The district court identified two of those in its effort to distinguish our decision in *Miller*, 481 F.3d 468: *Wright v. Van Patten*, 552 U.S. 120 (2008), and *Woods v. Donald*, 575 U.S. 312 (2015). But neither case offers help in answering the question we face. *Wright v. Van Patten* concerned whether it was clearly established that a defense counsel's appearance at a plea hearing by speakerphone was the equivalent of a complete denial of counsel. The Court ruled that *Cronic* did not go that far. 552 U.S. at 125. Indeed, recent experience has shown that remote presence is a relatively good substitute for a great many things. The problem for Lewis was not, as in *Van Patten*, that his lawyer's assistance was occurring via telephone or Zoom; it is that his attorney did absolutely nothing for him regardless of format. The Court similarly declined to apply *Cronic* in *Woods v. Donald*, a situation in which defense counsel was briefly absent from his

client's joint criminal trial and missed the beginning of a government witness's testimony about codefendants' actions. 575 U.S. at 317–19. Lewis does not allege that his attorney was *physically* absent at any relevant time. Neither *Van Patten* nor *Woods* thus advances the analysis here.

*Cronic* is far from a dead letter in the Supreme Court. To the contrary, as recently as October Term 2018, in *Garza v. Idaho*, 139 S. Ct. 738 (2019), the Court reaffirmed *Cronic*'s holding. *Garza* was a case in which an attorney in a criminal case failed to file a notice of appeal for a defendant, despite the fact that the defendant asked the attorney to do so. Normally, under those circumstances prejudice is presumed, regardless of how likely an appeal would be to change the result. See *Roe v. Flores-Ortega*, 528 U.S. 470, 484 (2000). But Garza had signed two plea agreements in which he waived his right to appeal. 139 S. Ct. at 742.

Based on those waivers, counsel informed Garza that he was not going to initiate an appeal. Garza sought post-conviction relief in Idaho's state courts, but they ruled that he needed to show both deficient performance and prejudice, and that he had not done so. The Supreme Court reversed.

It began by reiterating that "in certain Sixth Amendment contexts, … prejudice is presumed." *Id.* at 744 (quotations omitted). It elaborated as follows:

> For example, no showing of prejudice is necessary if the accused is denied counsel at a critical stage of his trial, *United States v. Cronic*, 466 U.S. 648, 659 (1984), or left entirely without the assistance of counsel on appeal, *Penson v. Ohio*, 488 U.S. 75, 88 (1988). Similarly, prejudice is presumed if counsel entirely fails to subject

the prosecution's case to meaningful adversarial test-
ing. *Cronic*, 466 U.S. at 659. And, most relevant here,
prejudice is presumed when counsel's constitutionally
deficient performance deprives a defendant of an ap-
peal that he otherwise would have taken. *Flores-Ortega*,
528 U.S. at 484. We hold today that this final presump-
tion applies even when the defendant has signed an
appeal waiver.

139 S. Ct. at 744 (cleaned up). With respect to the case before
it, the Court underscored that appeal waivers do not inevita-
bly block all further recourse: some matters might fall outside
the scope of a waiver, the prosecution might forfeit the benefit
of a waiver, or the waiver might be unenforceable on the
ground that it was unknowing or involuntary. *Id.* at 744–45. It
therefore found that the presumption of prejudice recognized
in *Flores-Ortega* applied to Garza's case and remanded for fur-
ther proceedings.

Years earlier, the Court had also discussed the *Cronic* rule,
albeit in the context of a proceeding in which it found that the
rule did not apply. The case was *Nixon*, *supra*, 543 U.S. 175
(2004), a capital case that came to the Supreme Court after the
Florida Supreme Court resolved the defendant's state post-
conviction petition. Before trial, counsel informed his client,
Nixon, that he intended to concede guilt at the outset of the
trial, in the hope that this would persuade the jury not to rec-
ommend death during the penalty phase. *Id.* at 178. Nixon did
not respond one way or the other to this statement, and so
counsel followed his planned strategy.

The Florida Supreme Court found that counsel's decision
effectively to concede guilt without having Nixon's express
consent to do so amounted to constitutionally ineffective

performance, and that such a concession of guilt triggered the *Cronic* presumption of prejudice. *Id.* at 188–89. The Supreme Court held that the state court erred in both respects. At least in a case such as Nixon's, where counsel fully informed the client of his proposed trial strategy and the client raised no objection, counsel was entitled to proceed as planned. Moreover, in a passage that is relevant to our case, it found that this was not an occasion for presumed prejudice:

> *Cronic* recognized a narrow exception to S*trickland*'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense. *Cronic* instructed that a presumption of prejudice would be in order in circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified. 466 U.S., at 658. The Court elaborated: "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.,* at 659; see *Bell v. Cone,* 535 U.S. 685, 696–697 (2002) (for *Cronic*'s presumed prejudice standard to apply, counsel's failure must be complete). We illustrated just how infrequently the surrounding circumstances [will] justify a presumption of ineffectiveness in *Cronic* itself. In that case, we reversed a Court of Appeals ruling that ranked as prejudicially inadequate the performance of an inexperienced, underprepared attorney in a complex mail fraud trial. 466 U.S., at 662, 666.

543 U.S. at 190 (cleaned up). See also *Kansas v. Ventris*, 556 U.S. 586, 591 (2009) (citing *Cronic* for the proposition that the right to counsel "ensur[es] that the prosecution's case is subjected to 'the crucible of meaningful adversary testing'").

Although it is possible, as the Supreme Court itself did in *Cronic* and as the district court here did, to identify particular circumstances in which the *Cronic* rule will apply, we must take the Court at its word when it says that it is simply offering illustrations of the rule announced by the Court. We have cautioned before that "[j]udicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 462 (1978)). More to the point, the Supreme Court itself has expressly stated that section 2254(d)(1) does not demand a clone in prior law. *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000). As the Court has put this point, section 2254(d)(1) does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied" nor does it "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (cleaned up). Instead, "state courts must reasonably apply the rules squarely established by [the Supreme Court]'s holdings to the facts of each case." *White v. Woodall*, 572 U.S. 415, 427 (2014). As applied here, that means that we must pay heed to *Cronic*'s core holding: that a showing of prejudice is not necessary in "situations in which counsel has entirely failed to function as the client's advocate." *Nixon*, 543 U.S. at 189. Implicit in this formulation

is the need to show that this extreme failure occurred during a critical stage of the proceedings. Lewis has done just that.

2.  Critical Stage

Before proceeding to apply these principles to Lewis's case, we confirm that the Supreme Court has emphasized for years the "critical nature of sentencing in a criminal case[.]" See *Mempa v. Rhay*, 389 U.S. 128, 134 (1967). The Court reconfirmed that the Sixth Amendment right to counsel exists during the sentencing phase in *Lafler v. Cooper*, 566 U.S. 156 (2012):

> The precedents also establish that there exists a right to counsel during sentencing in both noncapital, see *Glover v. United States,* 531 U.S. 198, 203–204 (2001); *Mempa v. Rhay,* 389 U.S. 128 (1967), and capital cases, see *Wiggins v. Smith,* 539 U.S. 510, 538 (2003). Even though sentencing does not concern the defendant's guilt or innocence, ineffective assistance of counsel during a sentencing hearing can result in *Strickland* prejudice because "any amount of [additional] jail time has Sixth Amendment significance." *Glover, supra*, at 203.

566 U.S. at 165. This passage relates only to the question whether the Sixth Amendment applies at all to proceedings before and after trial; it does not address the distinction between a *Strickland* claim and a *Cronic* claim; hence, the reference to prejudice is of no moment.

To the extent a court of appeals decision is relevant, we think it helpful to explain why our en banc decision in *Schmidt v. Foster*, 911 F.3d 469 (7th Cir. 2018), has no bearing on whether the sentencing phase in Lewis's case was a "critical phase" for Sixth Amendment purposes. In *Schmidt*, before

defendant Schmidt's trial on first-degree intentional homicide charges began, the trial court had to make a decision about whether to admit evidence relating to a defense of adequate provocation. It decided to hold an *ex parte*, *in camera* examination of Schmidt to help it assess whether he could pursue this defense. Schmidt's lawyer was present for that examination, but the court admonished counsel not to say anything, and the lawyer complied. The trial court ultimately decided to disallow the defense; Schmidt was convicted; and after proceedings that need not detain us, he argued in a petition under section 2254 that he had suffered a complete deprivation of counsel at a critical phase and thus was entitled to relief under *Cronic*.

Bearing in mind the highly deferential approach to state-court rulings that section 2254(d) requires, the en banc court rejected Schmidt's argument. After canvassing the relevant cases, the court first held that the Supreme Court had never had the occasion to consider the unusual circumstances that Schmidt's case presented: a deprivation of counsel during a *pre-trial, in camera, examination* that related to the admissibility of evidence. 911 F.3d at 480. Moreover, the en banc court viewed the course of events through a broader lens than Schmidt had urged. That broader perspective showed that counsel was able to help Schmidt in several ways with respect to the proposed evidence: he filed a notice of the provocation defense, he argued for its application in court hearings, he briefed the law, he submitted a detailed offer of proof, and he gave the court a witness list. The fact that counsel was barred from offering assistance during the *in camera* hearing, the court said, did not render the rest of counsel's assistance meaningless. Or at least, the court held, the state courts were

entitled to view the case this way, and that was enough to require denial of the writ.

In our case, unlike *Schmidt*, the Supreme Court has spoken specifically to the question whether the phase in question—sentencing—is a "critical" one. As we noted earlier, the answer is an unambiguous yes. And as we will see below, the other distinction between Lewis's case and Schmidt's is the degree of help that counsel offered—significant for Schmidt, nonexistent for Lewis.

### III

We do not need to decide for ourselves whether trial counsel's performance at sentencing was deficient. We have only to defer to the finding of the Indiana Court of Appeals in *Lewis II*, to which we referred at the outset of this opinion. That court described counsel's performance as "clearly deficient," and we agree with that assessment. Where we part company is with *Lewis II*'s approach to *Cronic*. The court began by reviewing the three situations that *Cronic* itself had mentioned and that we noted earlier: ( 1) a complete denial of counsel at a critical stage of trial; (2) the entire failure to subject the prosecution's case to meaningful adversarial testing; and (3) a situation in which counsel is called upon to render assistance under circumstances where even competent counsel could not do so. *Lewis II*, ¶ 38. In the state court, Lewis stressed the second of those three considerations, but the court did not confine its analysis to that situation. Rightly so, we think—as we noted earlier, judicial opinions are not statutes and should not be treated in such a rigid way.

But nothing turns on whether we see *Cronic* as establishing three exclusive categories, or as stating a principle and

offering three illustrations. In the end, the state court simply noted (accurately) that the *Cronic* exception is a narrow one, rarely applied by the Supreme Court. Without another word, it then turned to *Strickland*, which it read as confining presumed prejudice in various ways. 466 U.S. at 692–93. It did not explain why, in the case before it, Lewis had not suffered exactly the fate the *Strickland* Court had mentioned: the actual or constructive *absolute* denial of the assistance of counsel (*Cronic* category one). Naturally, someone whose lawyer has left him in the lurch that way will also fail to subject the prosecutor's case to meaningful adversarial testing (*Cronic* category two). In cases such as Lewis's, there is thus no operative difference between the first and the second of *Cronic*'s examples.

The closest the state court came to supporting its conclusion that *Cronic* does not apply to Lewis's case is in the following passage:

> Moreover, since *Cronic* was decided in 1984, the U.S. Supreme Court has never applied the second exception [*i.e.* lack of adversarial testing] to relieve a convicted defendant of the need to prove prejudice, nor has the Indiana Supreme Court. In *Bell* [*v. Cone*, 535 U.S. 685 (2002)], the Court simply spoke of "the *possibility* of presuming prejudice based on an attorney's failure to test the prosecutor's case" where the attorney's failure is complete. *Bell*, 535 U.S. at 696–97 (emphasis supplied). Ultimately, the Court concluded in *Bell*: "The aspects of counsel's performance challenged by respondent—the failure to adduce mitigating evidence and the waiver of closing argument—are plainly of the same ilk as other specific attorney errors we have

held subject to *Strickland*'s performance and prejudice components." *Id.* at 697–98.

We are not persuaded that Lewis's claim falls within one of the limited circumstances of extreme magnitude that justify a presumption of ineffectiveness under *Cronic*. The post-conviction court, therefore, correctly determined that Lewis was required to establish prejudice under *Strickland*.

*Lewis II* at ¶¶ 42, 43.

Entirely missing from the state court's brief discussion is an acknowledgment of the day-and-night difference between the assistance that Cone received during the sentencing phase of his case and that which Lewis got. Cone, in a word, had plenty of help. The sentencing hearing was a separate part of Cone's trial. The state opened by telling the jury that it planned to prove four aggravating factors that would justify the death penalty. Defense counsel responded in his own opening statement by calling to the jury's attention "the mitigating evidence already before them", and by suggesting that Cone "was under the influence of extreme mental disturbance or duress, that he was an addict whose drug and other problems stemmed from the stress of his military service, and that he felt remorse." 535 U.S. at 691. Counsel also urged the jury to be merciful. Already, we note, Cone received far more than Lewis did. But that was just the start for Cone—there was much more. His lawyer cross-examined the state's witnesses and objected to the introduction of gory photographs. He chose to waive final argument because this prevented the state from arguing in rebuttal. It is hardly a surprise that the Supreme Court did not regard Cone's lawyer's performance as either the equivalent of a total lack of counsel, or the

"entire" failure to subject the prosecutions' case to meaningful adversarial testing. It was neither.

Let's take another look at Attorney Raff's "assistance" during the *entire* sentencing phase. In essence, it was nothing but a statement that he was bowing out. He uttered two short sentences: "Judge, I'm going to defer to Mr. Lewis if he has any comments. I don't have anything to add." This went beyond a failure to conduct adversarial testing; it was an announcement of abandonment. The state suggests that Raff did have a strategy, and that was to allow Lewis to speak for himself in the hope that he *might* express remorse. This has the flaw of having no support in the record. Raff never communicated any such strategy to Lewis, and so Lewis had no guidance from counsel about what he might do with his allocution when he had the chance to speak. This theory also conflicts with Raff's testimony at the post-conviction hearing. He never said that he was trying to guide Lewis in this way. Instead, he said that he thought that there were no mitigating factors in Lewis's case. Actually, he had no idea one way or the other, because he never asked Lewis about his mental-health history and he never requested Lewis's medical records. He did not try to prepare Lewis for the hearing because he found Lewis "difficult" and "angry." It is of no moment that four jurists (whom we presume were acting in good faith) disagreed with *Cronic*'s application. The question is an objective one and does not rest "on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did … ." *Williams*, 529 U.S. at 409–10.

Contrary to the dissent's assertions, our opinion in no way conflicts with the holdings in *Woods v. Donald*, *Cone*, or *Nixon*. None of these cases involved the total absence of counsel (or

its functional equivalent) at a critical stage. That is what we have here. By contrast, in *Woods* counsel was briefly absent during the testimony of a co-defendant. As discussed earlier, counsel in *Nixon* fully informed his client of his proposed strategy, and counsel in *Cone* subjected the prosecution's case to adversarial testing. Today's outcome faithfully follows *Cronic*, because we are faced with the extraordinary situation of a lawyer's total abandonment of his client at the critical sentencing state.

## IV

If Raff was going to fall back to a plea for mercy, or an effort to convince Lewis to demonstrate remorse, he had to take *some* step in that direction. He did not. Instead, he gave up on Lewis and left him entirely without the assistance of counsel at the sentencing stage of a felony murder case. Rare though *Cronic* cases may be, we think that this one qualifies.

We therefore REVERSE the judgment of the district court and REMAND this case for the issuance of a writ of habeas corpus, limited to the sentencing phase of petitioner Roderick Lewis's case.

BRENNAN, *Circuit Judge*, dissenting. If this were a direct appeal, I might join the majority opinion. All can agree Roderick Lewis's counsel should have done more on his behalf at sentencing. Such minimal involvement occurred at a critical stage in a criminal case. But Lewis's appeal comes to us as a collateral attack on a state court judgment under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). In his petition for a writ of habeas corpus, Lewis contends his counsel's silence at sentencing requires us to apply the presumption of prejudice described in *United States v. Cronic*, 466 U.S. 648 (1984), to an ineffective assistance of counsel claim otherwise governed by *Strickland v. Washington*, 466 U.S. 668 (1984). AEDPA requires that we grant habeas relief to Lewis only when the Supreme Court has answered the specific question of whether *Cronic*—and not *Strickland*—applies, and the state court has issued a decision contravening that answer. 28 U.S.C. § 2254(d)(1).

No Supreme Court decision holds that silence at sentencing by defense counsel triggers *Cronic*'s presumption of prejudice. Three courts have declined Lewis's invitation to apply *Cronic* in this novel circumstance. Despite the stringent standards of AEDPA, our court accepts the invitation. This decision avoids AEDPA's confines and expands *Cronic*'s scope, reading it too generally and combining its exceptions. Review of Lewis's habeas petition should end with AEDPA, so I respectfully dissent.

## I.  AEDPA Review

AEDPA's strict standard of review results in great deference to state courts. The grant of Lewis's habeas petition lacks the requisite precision under 28 U.S.C. § 2254(d)(1), neglecting

the critical importance of comity to our federal habeas system.

### A. AEDPA's Strictures

AEDPA deference is more than a judicial guidepost; it is a Congressional mandate. *See Woodford v. Garceau*, 538 U.S. 202, 206 (2003). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). By its plain text, AEDPA precludes a federal court from granting a state prisoner's habeas petition unless the state court's merits adjudication "resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1) (emphases added). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

Section 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meaning. *Bell v. Cone*, 535 U.S. 685, 694 (2002); *see also Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). A federal court may grant habeas relief under the "contrary to" clause "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Cone*, 535 U.S. at 694. For example, if a state court applies *Strickland* when it should apply *Cronic*, we may issue the writ as the state court judgment is "contrary to" Supreme Court precedent. *Cf. id.* at 698 (rejecting a petitioner's claim that *Cronic*, not *Strickland*, should apply and noting "we find no merit in respondent's contention

that the state court's adjudication was *contrary to* our clearly established law" (emphasis added)). Under the "unreasonable application of" clause, a federal court may grant habeas relief "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* at 694. So if a state court applies *Strickland* to the facts of a case "in an objectively unreasonable manner[,]" we may issue the writ. *Id.* at 699.

Under either clause of § 2254(d)(1), a petitioner's habeas claim is measured against the last reasoned state-court decision on the merits. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). To grant relief, that state court's decision must be "contrary to" or an "unreasonable application of" Supreme Court precedent, not our own. *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" (quoting 28 U.S.C. § 2254(d)(1)).

Standing alone, AEDPA exudes deference. But for ineffective assistance of counsel claims, "[t]he federal courts as a whole engage in 'doubly deferential' review" under AEDPA. *Wilborn v. Jones*, 964 F.3d 618, 620 (7th Cir. 2020), *cert. denied*, No. 20-913, 2021 WL 666799 (U.S. Feb. 22, 2021) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). We layer deference upon deference in these cases because federal courts must give "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013). Even without AEDPA, ineffective assistance of counsel claims remain difficult to prove as "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "That hill is even steeper"

for claims governed by AEDPA. *Myers v. Neal*, 975 F.3d 611, 620 (7th Cir. 2020). As the Supreme Court said recently, AEDPA takes on a "special importance" when a state prisoner asserts the ineffectiveness of his counsel. *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020).

## B. The Majority Opinion's Application of AEDPA

The majority opinion holds that the Court of Appeals of Indiana's decision in *Lewis v. State*, 116 N.E.3d 1144 (Ind. Ct. App. 2018) (*Lewis II*), is both "contrary to" and an "unreasonable application of" Supreme Court precedent under § 2254(d)(1). In its only specific reference to the text of that standard, it states: "We conclude that the decision of the last responsible state court was contrary to Supreme Court precedent, insofar as it held that *Strickland*, not *Cronic*, furnished the applicable rule, and it was an unreasonable application of *Cronic*, insofar as it focused on that case." Majority Op. at p. 2 (footnote omitted). But these clauses are distinct, with each having independent meaning. *Cone*, 535 U.S. at 695 ("[Section] 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning."). Implicit within an "unreasonable application of" Supreme Court precedent is that the state court applied the correct legal rule but did so unreasonably to the facts at hand. Conversely, if a state court applies the incorrect rule, its decision is "contrary to" Supreme Court precedent from the start and we need not reach the reasonability of its application. For the majority opinion, *Lewis II* is worthy of correction under both clauses.

AEDPA requires more precision. *Cone* teaches that if a state court applies *Strickland* when it should apply *Cronic* (or vice versa), that error implicates the "contrary to" clause of § 2254(d)(1). *See Cone*, 535 U.S at 698. This is because "[f]or

purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind." *Id.* at 697 (footnote omitted). Admittedly, the Supreme Court has not always followed this procedure when engaging with *Cronic*. *Compare Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam) (rejecting *Cronic*'s application under the "unreasonable application of" clause), *with Woods v. Donald*, 575 U.S. 312, 317–18 (2015) (per curiam) (rejecting *Cronic*'s application under both the "contrary to" and "unreasonable application of" clauses). That may be because, in these cases, the Supreme Court has denied relief, not granted it. In other words, whether a state court's decision was "contrary to" or an "unreasonable application of" Supreme Court precedent did not matter. The petitioner's claim failed either way. When a petitioner's claim succeeds, however, and a federal court on habeas review overrules a state court's decision, precision is a must. Otherwise, we disregard AEDPA's text and do not respect the independent meaning of each clause.[1]

To be sure, the "contrary to" clause might be an easier path for a habeas petitioner than the "unreasonable application of" clause. *But see Williams*, 529 U.S. at 405 ("The word 'contrary' is commonly understood to mean 'diametrically

---

[1] The majority opinion collects several cases to support consideration of the state court's decision under both clauses of § 2254(d)(1). Maj. Op. at p. 2 n.1. But among the cases cited are rulings that recognized the independent meaning of each clause, even if the state court decision at issue in the end violated both. In *Bailey v. Rae*, the Ninth Circuit explained the distinct clauses, and gave independent reasoning under each. 339 F.3d 1107, 1111–12, 1118–19 (9th Cir. 2003). *Pazden v. Maurer* is much the same. 424 F.3d 303, 311–12, 319 (3d Cir. 2005), as is *Breakiron v. Horn*, 642 F.3d 126, 131, 139 (3d Cir. 2011). To the extent these cases correctly state the law, they recognize that the two clauses differ.

different,' 'opposite in character or nature,' or 'mutually op-posed.'" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 495 (1976)). An "unreasonable application" means more than just error: "The question under AEDPA is not whether a federal court believes the state court's determi-nation was incorrect but whether that determination was un-reasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Or as this court has said, "[w]e must deny the writ if we can posit arguments or theo-ries that could have supported the state court's decision, and if fairminded jurists could disagree about whether those ar-guments or theories are inconsistent with Supreme Court holdings." *Kidd v. Lemke*, 734 F.3d 696, 703 (7th Cir. 2013). To grant Lewis habeas relief under the "unreasonable applica-tion of" clause, the state court's application of *Strickland*, not *Cronic*, must be unreasonable; that is how the Supreme Court approached *Cone*, and that is how to ensure the independent meaning of the two clauses. *See Cone*, 535 U.S. at 698.

Yet even if the state court unreasonably applied *Cronic*, the implication of the majority opinion is that no "fairminded ju-rist could disagree" that *Cronic* should supplant *Strickland* here. On direct review, four jurists disagreed with *Cronic*'s ap-plication; two more did so under AEDPA.[2] Although this nu-merical disparity does not alone doom Lewis's appeal, it shows that under the majority opinion, this would be the only court that has embraced *Cronic*, doing so under both clauses of § 2254(d)(1). If AEDPA is satisfied here, the clause under

---

[2] One judge from the Allen County Superior Court, three judges from the Court of Appeals of Indiana, one judge from the U.S. District Court for the Northern District of Indiana, and myself.

which the state court's decision is purportedly incorrect should be specified as one or the other.

Animating AEDPA's strictness is a faith in comity. "AEDPA recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Titlow*, 571 U.S. at 19. Indeed, "AEDPA's requirements reflect a 'presumption that state courts know and follow the law.'" *Woods*, 575 U.S. at 316 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). That means "[w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 575 U.S. at 316. This is particularly so when state courts adjudicate ineffective assistance of counsel claims:

> Especially where a case involves such a common claim as ineffective assistance of counsel under *Strickland*—a claim state courts have now adjudicated in countless criminal cases for nearly 30 years—"there is no intrinsic reason why the fact that a man is a federal judge should make him more competent, or conscientious, or learned … than his neighbor in the state courthouse."

*Titlow*, 571 U.S. at 19 (quoting *Stone v. Powell*, 428 U.S. 465, 494 n.35 (1976)). AEDPA review is so rigorous for *Strickland* claims because comity demands it. *See Calderon v. Thompson*, 523 U.S. 538, 555–56 (1998) ("Federal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." (internal quotation marks omitted)).

Comity's force here is not just in principle, but in practice. The Indiana state courts have worked on Lewis's case for some time and have a significant interest in this litigation. In 2012, Lewis went to trial in the Allen County Superior Court for his role in a crime committed 13 years earlier in 1999. *Lewis II*, 116 N.E.3d at 1148–50, ¶¶ 6–12. After his conviction and sentencing, Lewis directly appealed, challenging the sufficiency of the evidence against him. *Lewis v. State*, 973 N.E.2d 110, No. 02A03-1201-CR-18, 2012 WL 3777134 (Ind. Ct. App. 2012) (unpublished table decision) (*Lewis I*). In 2013, Lewis filed a pro se post-conviction petition, and in 2016, post-conviction counsel amended that petition. *Lewis II*, 116 N.E.3d at 1150, ¶ 14. In 2017, the Allen County Superior Court held an evidentiary hearing. *Id.* In 2018, that court, in a "lengthy order[,]" denied Lewis relief and, as relevant in this appeal, also rejected *Cronic*. *Id* at 1150–53, ¶¶ 16–17. In the decision at issue here, *Lewis II*, the Court of Appeals of Indiana affirmed that denial of relief later in 2018, *id.* at 1160, ¶¶ 45–46, with the Indiana Supreme Court ultimately denying leave to transfer in 2019. *Lewis v. State*, 124 N.E.3d 41 (Ind. 2019) (unpublished table decision). This procedural history shows that Lewis's case has received thorough consideration by various Indiana courts, not to mention the district court here. AEDPA makes clear "that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington*, 562 U.S. at 103.

All of this is true even before accounting for the "special importance" of AEDPA to ineffective assistance of counsel claims adjudicated by state courts. *Shinn*, 141 S. Ct. at 523. Absent from the majority opinion's treatment of Lewis's claim is recognition of the "doubly deferential" nature of the review this court must conduct. *Mirzayance*, 556 U.S. at 123. Because

"state courts know and follow the law[,]" *Woods*, 575 U.S. at 316 (internal quotation marks omitted), they understand that the scope of *Cronic* has been significantly curtailed; indeed, that is why they declined to apply it here. *Lewis II*, 116 N.E.3d at 1159, ¶ 43 ("We are not persuaded that Lewis's claim falls within one of the limited circumstances of extreme magnitude that justify a presumption of ineffectiveness under *Cronic*." (footnote omitted)). All told, the type of claim the petitioner makes requires him to overcome AEDPA, surpass *Strickland*, and trigger *Cronic*. That is quite the gauntlet. In fact, it is one of the most doctrinally difficult challenges a state prisoner can make in this area of law. AEDPA's text, along with its directive of deference, instructs that we must give independent meaning to each clause of § 2254(d)(1).

## II.  The Narrow Scope of *Cronic*

The Supreme Court and this court narrowly construe and rarely apply *Cronic*. The majority opinion expands *Cronic*'s scope and unsoundly combines its first and second exceptions.

### A.  *Cronic* Defined

*Cronic* is a hard-to-meet exception to the already hard-to-meet standard of *Strickland*. Under *Strickland*, an ineffective assistance of counsel claim requires a showing that the attorney's performance was not only deficient, but also prejudicial. 466 U.S. at 687. Deficiency occurs when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Proving prejudice requires that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

*Strickland* sets a high bar, which makes *Cronic*'s presumption of prejudice an appealing option for litigants. *Cf. Padilla v. Kentucky*, 559 U.S. 356, 371 (2010) ("Surmounting *Strickland*'s high bar is never an easy task.").

With *Cronic*'s strength, though, comes its rarity. *See, e.g.*, *Florida v. Nixon*, 543 U.S. 175, 190 (2004). Under *Cronic*, courts may presume prejudice only when there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658 (footnote omitted). But even *Cronic* itself did not result in this presumption of prejudice. *Id.* at 666. Instead, the Supreme Court in *Cronic* pronounced three exceptions to *Strickland* that permit the presumption of prejudice:

> 1. When there has been a "complete denial of counsel[,]" because "a trial is unfair if the accused is denied counsel at a critical stage of his trial.";
>
> 2. "[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."; and
>
> 3. "[W]hen although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."

466 U.S. at 659–60 (footnote omitted). When a defendant's case presents one of these three circumstances, *Cronic* is

triggered, prejudice is presumed, and *Strickland*'s second prong is satisfied.

*Cronic*'s narrowness derives not just from its result, but from its reasoning. Whether called "illustrations," "examples," "circumstances," "scenarios," or "situations," what matters is that each operates as an exception to the onerous *Strickland* standard, and that there are three—and only three—of them. *See, e.g.*, *Cone*, 535 U.S. at 695 (identifying "three situations implicating the right to counsel that involved circumstances 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified'" (quoting *Cronic*, 466 U.S. at 658)); *Reynolds v. Hepp*, 902 F.3d 699, 705 (7th Cir. 2018) (same). That *Cronic* is triggered in only three ways reflects the narrowness with which its presumption should be applied.

Recently, this court endorsed this understanding of *Cronic* in *Schmidt v. Foster*, an en banc decision declining under AEDPA to presume prejudice when a trial judge conducted an *ex parte*, *in camera* examination without defense counsel's active participation. 911 F.3d 469, 478 (7th Cir. 2018) (en banc). This court began its analysis in *Schmidt* by noting that *Cronic* and its progeny "come with two caveats." *Id.* at 479. First, *Cronic*'s presumption of prejudice is "narrow" and "arises only when the denial of counsel is extreme enough to render the prosecution presumptively unreliable." *Schmidt*, 911 F.3d at 479. And second, because the Supreme Court has spoken only generally about *Cronic*, "the 'precise contours' of these rights 'remain unclear.'" *Schmidt*, 911 F.3d at 479 (quoting *Woods*, 575 U.S. at 318). That means "[s]tate courts therefore enjoy broad discretion in their adjudication of them." *Schmidt*, 911 F.3d at 479 (footnote and internal quotation marks

omitted). *Schmidt* recognized the three exceptions of *Cronic* and rejected applying the first—"the complete denial of counsel during a critical stage." 911 F.3d at 478 & n.2, 480. Because Schmidt's counsel had assisted him before, during a recess, and after the *in camera* examination, he did not suffer the "complete" deprivation of counsel necessary to presume prejudice under *Cronic*'s first exception, even though the trial court prevented his counsel from speaking during the in chambers hearing. *Id.* at 480–85.[3]

Although *Schmidt*'s outcome may not control, and these facts differ, this court's reasoning is instructive. Bound by AEDPA, this court engaged in a comprehensive examination of *Cronic* and cases interpreting it to decide that "[n]o clearly established holding of the Supreme Court mandate[d]" the presumption of prejudice for an *ex parte*, *in camera* examination without defense counsel's active participation. 911 F.3d at 481. In doing so, this court rejected an attempt to generalize what, under AEDPA, must be specific: "If we must take several dissimilar decisions and reduce them to blanket principles in order to arrive at a general proposition applicable here, the proposition is 'far too abstract to establish clearly the specific rule' [petitioner] needs." *Id.* at 483–84 (quoting *Lopez v. Smith*, 574 U.S. 1, 6 (2014) (per curiam)). Relevant here, this court also observed that "the Supreme Court has never addressed a case like [Schmidt's]." *Schmidt*, 911 F.3d at 485. So "[w]ithout clearly established law mandating relief, we [could not] grant it under AEDPA." *Id.*

---

[3] *Schmidt* assumed that the *ex parte, in camera* examination was a "critical stage." 911 F.3d at 480.

### B. *Cronic* Applied

The Supreme Court rarely applies *Cronic*, and when it does, it reads the decision narrowly. Since *Cronic*'s advent nearly 40 years ago, the Supreme Court has applied it only once to presume prejudice. *See Penson v. Ohio*, 488 U.S. 75, 88 (1988) (holding that "the presumption of prejudice must extend as well to the denial of counsel on appeal" when the granting of an attorney's motion to withdraw had left the petitioner "entirely without the assistance of counsel on appeal"). Although the majority opinion is correct that the Supreme Court recently cited *Cronic* in *Garza v. Idaho*, 139 S. Ct. 738, 744 (2019), the Supreme Court has not applied *Cronic* to grant relief since *Penson*.

This court has followed the Supreme Court's lead, reading *Cronic* narrowly and applying it rarely. *See, e.g.*, *Schmidt*, 911 F.3d at 479. Lewis musters only two cases where this court applied *Cronic*'s presumption on habeas review. *Miller v. Martin*, 481 F.3d 468, 473 (7th Cir. 2007) (post-AEDPA); *Patrasso v. Nelson*, 121 F.3d 297, 305 (7th Cir. 1997) (pre-AEDPA). Other circuit courts have taken this same guarded approach. *See, e.g.*, *United States v. Roy*, 855 F.3d 1133, 1144 (11th Cir. 2017) (en banc) ("The difficulty of carrying that 'very heavy' burden and the 'very narrow' scope of the *Cronic* exception are evident from the fact that the Supreme Court has repeatedly refused to find it applicable.").

Exceptions by their nature are narrow, so it is no surprise that the Supreme Court has limited *Cronic* to the three described above. *See, e.g.*, *Cone*, 535 U.S. at 695. When the Court has not specifically listed the three exceptions, it has still denied relief. *See, e.g.*, *Woods*, 575 U.S. at 317–18, 319. This court has read *Cronic* the same way. *See Schmidt*, 911 F.3d at 478 &

n.2. Even in *Miller*, when this court applied *Cronic*'s presumption, it did so within the three-exception framework. *Miller*, 481 F.3d at 472–73. *Patrasso* applied *Cronic*'s second exception, too. 121 F.3d at 303–05. Neither the Supreme Court nor this court has adopted the broad reading of *Cronic* in the majority opinion. For the majority opinion, "[a]lthough it is possible, as the Supreme Court itself did in *Cronic* and as the district court here did, to identify particular circumstances in which the *Cronic* rule will apply, we must take the Court at its word when it says that it is simply offering illustrations of the rule announced by the Court." Maj. Op. at p. 14. But the Court in *Cone* and this court in *Schmidt* did not read *Cronic* so expansively, as we recently acknowledged. *Cf. Fayemi v. Ruskin*, 966 F.3d 591, 594 (7th Cir. 2020) ("We have been told not to extend *Cronic* on collateral review.").

If adopted in future cases, this broad conception of *Cronic* could swallow *Strickland*'s prejudice prong. For example, if *Cronic* is read this broadly, several Supreme Court cases should have come out differently. Counsel would have triggered *Cronic* by conceding guilt in a capital case (*Nixon*), failing to affirmatively mount some case for life imprisonment in a capital case's penalty phase (*Cone*), and being absent during certain trial testimony concerning a codefendant (*Woods*). That each request to presume prejudice in these cases failed should give pause before applying such an expansive reading of *Cronic*.

Even where the majority opinion does engage with the three exceptions, it makes general under *Cronic* what must be specific under AEDPA. The majority opinion combines *Cronic*'s first and second exceptions. *See* Maj. Op. at p. 18 ("In cases such as Lewis's, there is thus no operative difference

between the first and the second of *Cronic*'s examples."). Rather than "nothing" turning on whether *Cronic* established three exclusive categories, *id*. at 17, its three exceptions have independent meaning, like the two clauses of § 2254(d)(1). *Cf. Cone*, 535 U.S. at 685. *Schmidt* recognized this three-exception framework and rejected applying *Cronic*'s first exception for complete denial of counsel at a critical stage. *Schmidt*, 911 F.3d at 478 & n.2, 480, 485. As we stated there, "only once in the thirty-plus years since *Cronic* has the Court applied the presumption of prejudice it described in a critical-stage case." *Id.* at 479 (citing *Penson*, 488 U.S. at 88). And in no case since *Cronic* has the Supreme Court applied the presumption of prejudice described in the second exception.[4] Yet despite the strictures of AEDPA, the rarity of *Cronic*, and the narrowness with which that case has been applied, the majority opinion finds Lewis's claim strong enough to fit both exceptions.

This court should not backtrack from the understanding of *Cronic* endorsed in *Schmidt*. According to the majority opinion, *Schmidt* differs in its "critical stage" and "degree of help that counsel offered." Maj. Op. at pp. 15, 17. But *Schmidt*'s relevance here is in its mode of analysis. That en banc decision teaches three lessons about *Cronic*: it is narrow in its rule, it gives state courts "broad discretion" in adjudicating the application of its exceptions, and it has three—and only three—exceptions. *Schmidt*, 911 F.3d at 478 & n.2.

These lessons led this court in *Schmidt* to address that *Cronic*-based habeas petition with the requisite particularity under AEDPA. Generalizing *Cronic* did not win the day there

---

[4] No Supreme Court case since *Cronic* appears to have applied its third exception, either.

and should not do so here. *Id.* at 483–84 ("If we must take several dissimilar decisions and reduce them to blanket principles in order to arrive at a general proposition applicable here, the proposition is far too abstract to establish clearly the specific rule [petitioner] needs." (internal quotation marks omitted)). As AEDPA required, *Schmidt* considered whether the Supreme Court had ever addressed a claim like that raised by the petitioner. It had not, so this court denied relief. *Id.* at 485. Because the same is true here, *Schmidt* should guide us to reject Lewis's habeas petition.

### III.  Supreme Court Treatment of *Cronic* and AEDPA

The Supreme Court has never confronted the novel circumstances presented by Lewis's claim. That should be enough to preclude habeas relief under AEDPA. The majority opinion emphasizes one case—*Cone*, where the Supreme Court declined to presume prejudice—at the expense of the rest of *Cronic*'s progeny.

### A.  What AEDPA Means for Cases Invoking *Cronic*

Looking through AEDPA's lens, we may grant habeas relief only when the Supreme Court has answered the "specific question" of whether *Cronic*—and not *Strickland*—applies and the state court has issued a decision "contrary to" this answer. *Woods*, 575 U.S. at 317 (quoting *Lopez*, 574 U.S. at 6); 28 U.S.C. § 2254(d)(1).

Lewis cannot meet this heavy burden imposed by AEDPA. A direct appeal would be a lighter lift, as it would turn on whether his lawyer's silence at sentencing fell within *Cronic*. AEDPA, however, constricts our review and requires that we ask whether the Supreme Court has held that silence at sentencing triggers the presumption of prejudice—the

"specific question." *Woods*, 575 U.S. at 317 (internal quotation marks omitted). This difference is dispositive: A tour through four Supreme Court cases addressing *Cronic*—*Cone*, *Nixon*, *Van Patten*, and *Woods*—demonstrates that the Supreme Court has never presumed prejudice based on the type of claim Lewis brings. That is "[a]ll that matters here[.]" *Id.* at 319.

Time and again, the Supreme Court has declined to apply *Cronic*. In *Cone*, the Court considered and rejected an argument that *Cronic's* second exception for lack of meaningful adversarial testing applied when counsel failed to "mount some case for life [imprisonment]" in a capital case's penalty phase. *Cone*, 535 U.S. at 696 (internal quotation marks omitted). In *Nixon*, the Court, outside the strictures of AEDPA, again rejected application of *Cronic*'s second exception by holding that a concession of guilt in a capital case "does not rank as a failure to function in any meaningful sense as the Government's adversary." *Nixon*, 534 U.S. at 190 (quoting *Cronic*, 466 U.S. at 666 (footnote omitted)).[5] In *Van Patten*, the Court denied *Cronic*'s first exception because its own precedents "do not clearly hold that counsel's participation by speakerphone should be treated as a 'complete denial of counsel,' on par with total absence." *Van Patten*, 552 U.S. at 125. And in *Woods*, the Court's most recent engagement with *Cronic*, it avoided presuming prejudice, without mentioning a specific exception, because it had "never addressed whether the rule announced in *Cronic* applies to testimony regarding codefendants' actions"—as in whether counsel's absence during

---

[5] The standard the majority opinion quotes when invoking *Cronic* to grant relief is from *Nixon*, 543 U.S. at 189. Maj. Op. at pp. 1, 14. The Court in *Nixon* declined to presume prejudice under *Cronic*. *Nixon*, 543 U.S. at 190.

that testimony triggers the presumption of prejudice. *Woods*, 575 U.S. at 317.

The Supreme Court has been reluctant to presume prejudice under *Cronic*. We should be as well. Of course, rare does not mean never. What matters under AEDPA is that the Court has never answered, let alone affirmatively, the question of whether silence at sentencing by defense counsel triggers *Cronic*. *See Van Patten*, 552 U.S. at 126 ("Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (alterations and internal quotation marks omitted)). This is so regardless of the clause under which the majority opinion proceeds. *See Woods*, 575 U.S. at 317 ("Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks omitted)). As the Court said in its last engagement with *Cronic* under AEDPA, "[a]ll that matters here, and all that should have mattered to the Sixth Circuit, is that we have not held that *Cronic* applies to the circumstances presented in this case. For that reason, federal habeas relief based upon *Cronic* is unavailable." *Id.* at 319. So it is here for this court.

## B. Correctly Applying AEDPA to *Cronic* in this Case

Under either clause of § 2254(d)(1), the majority opinion's broad reading of *Cronic* cuts against applying it on these facts. Such expansive treatment of *Cronic* comes closer to de novo review, which AEDPA does not permit.

*Lewis II* is neither "contrary to" nor an "unreasonable application of" Supreme Court precedent concerning *Cronic*. To

implicate the "contrary to" clause, a state court decision must apply the wrong legal rule or deviate from a factually indistinguishable case. *See Cone*, 535 U.S. at 694. If the majority opinion proceeds under that clause, it commits the same errors the Supreme Court corrected in *Woods*, 575 U.S. at 317 (noting that the Sixth Circuit's application of *Cronic* was "doubly wrong"). First, as in *Woods*, the majority opinion relies upon cases that are only "similar to" Supreme Court precedent, which means "the state's court's decision is not 'contrary to' the holdings in those cases." *Id.* But the Sixth Circuit in *Woods* at least had affirmative case law to rely on. None of the decisions cited in the majority opinion granted relief under *Cronic*. Second, the majority opinion "frame[s] the issue at too high a level of generality." *Woods*, 575 U.S. at 318. As discussed, no Supreme Court case holds that silence at sentencing triggers *Cronic*'s presumption of prejudice. *Cf., e.g., id.* at 317–19; *Van Patten*, 552 U.S. at 124–26; *Nixon*, 543 U.S. at 190-93; *Cone*, 535 U.S. at 693–98; *but see Penson*, 488 U.S. at 88-89. In sum, like the petitioner in *Woods*, Lewis cannot show that *Lewis II* was "contrary to" Supreme Court precedent.

The fate of Lewis's claim is the same under the "unreasonable application of" clause of § 2254(d)(1). Under that clause, the broader the rule, the more room state courts have to apply it. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."). For our purposes, the broader the majority opinion reads *Cronic*, the more room *Lewis II* has to apply it. *Cf.* Maj. Op. at p. 14. This means that *Lewis II* must be "not merely wrong" or "even clear error." *Woods*, 575 U.S. at 316 (quoting *Woodall*, 572 U.S. at 419). Rather, it must be so objectively unreasonable that no

"fairminded jurist" could reach its conclusion. *Kidd*, 734 F.3d at 703. The question then remains: Is *Lewis II* that wrong?

It is not. Given that the Supreme Court almost never applies *Cronic*, the Court of Appeals of Indiana's similar reticence is reasonable. The majority opinion faults *Lewis II* for its scant reasoning, despite the "broad discretion" conferred to state courts interpreting *Cronic*. *Woods*, 575 U.S. at 318 (internal quotation marks omitted). True, the state appeals court could have said more.[6] But perhaps *Lewis II*'s cursory treatment of *Cronic* shows how obviously it does not apply. *Cf. White v. Woodall*, 572 U.S. 415, 427 (2014) ("[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is *so obvious* that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question[.]" (quoting *Harrington*, 562 U.S. at 103) (emphasis added)). The opposite does not hold true: It is not "so obvious" that *Cronic*, and not *Strickland*, should apply here. *White*, 572 U.S. at 427.

Under either clause, the majority opinion's analysis of *Lewis II* comes closer to de novo review than the "doubly deferential" standard mandated under AEDPA for ineffective assistance of counsel claims. *Mirzayance*, 556 U.S. at 123; *cf. Harrington*, 562 U.S. at 101 ("Here it is not apparent how the Court of Appeals' analysis would have been any different without AEDPA."). In *Lewis II*, the Court of Appeals of Indiana considered, and rejected, Lewis's assertion of *Cronic*'s

---

[6] Like the Indiana Court of Appeals, I also "note that Attorney Raff's lack of advocacy at the sentencing hearing appears to have been, at least in part, invited by Lewis, who expressed clear disdain for counsel." *Lewis II*, 116 N.E.3d at 1160 n.10, ¶ 43 n.10.

second exception for lack for meaningful adversarial testing. 116 N.E.3d at 1159, ¶¶ 42–43 Ostensibly under AEDPA review, the majority opinion nevertheless crafts a hybrid rule—combining *Cronic*'s first and second exceptions—to cover Lewis's claim. *See* Maj. Op. at p. 18. For the majority opinion, *Cone* supports this proposition: Lewis's lawyer did less than the lawyer in *Cone,* which means *Cronic* should apply. *See id.* at pp. 18–21. But *Cronic*'s trigger is not so general, and *Cone*'s lesson is not so simple. If Lewis is to secure relief, he must fit within one of *Cronic*'s three exceptions, which *Cone* itself recognized. *Cone*, 535 U.S. at 696.

What is more, *Cone* is not the only benchmark by which to measure the merits of Lewis's claim under *Cronic*. The majority opinion rejects *Van Patten* and *Woods* because "Lewis does not allege that his attorney was *physically* absent at any relevant time. Neither *Van Patten* nor *Woods* thus advances the analysis here." Maj. Op. at p. 11. But if only constructive absence cases were relevant to our analysis, then the majority opinion would have little, let alone recent, affirmative support. *Herring v. New York*, 422 U.S. 853, 864–65 (1975) (presuming prejudice when a state law barred summation of the evidence); *Ferguson v. Georgia*, 365 U.S. 570, 571, 596 (1961) (presuming prejudice when a state law barred elicitation of client's trial testimony); *see also Schmidt*, 911 F.3d at 481. Instead, *Van Patten* and *Woods* serve as further examples of the only thing that matters in this appeal: No Supreme Court case has held that silence at sentencing by defense counsel triggers *Cronic*. On that ground, Lewis's petition should fail.

### IV. Conclusion

*Cronic*'s scope is narrow, AEDPA review is narrow, and AEDPA review of a *Cronic* case is especially narrow. Bound

by AEDPA, I would reject Lewis's habeas petition because no Supreme Court case has applied *Cronic* to the novel circumstances presented by his claim. I respectfully dissent.